Ms. Arsino Yes, Your Honor. May it please the Court, Anna Arsino on behalf of Petitioner Leon Tollette. Long before trial, counsel knew this case was headed to a capital sentencing hearing, and as they later explained, they wanted to present the most vigorous case in mitigation for Mr. Tollette. Yet their last-minute and half-hearted investigation into his background failed to uncover the profound and compelling life history that his jury was entitled to hear. To counter the State's 20 witnesses and aggravation, including five witnesses providing victim impact testimony, counsel presented the testimony of a single witness, Mr. Tollette's mother, who, in the span of 12 pages of the transcript, painted a fairytale portrait of a happy, normal childhood that was far from Mr. Tollette's reality. I'll begin by addressing this claim, the ineffective assistance of counsel claim, and then turn to the prosecutor's argument. Mr. Kraft and Mr. Watkins were representing Mr. Tollette in their first death penalty trial to go to a jury, and though they knew that Mr. Tollette had expressed early on that he desired to plead guilty and ultimately did, in fact, plead guilty, and that there was no guilt-phased defense in their minds, there was no question about the identity of the shooter, in this case. They waited until the 11th hour to begin their mitigation investigation, requesting from the court one month before the trial date for the assistance of a mitigation specialist. And it's important to know— Yeah, but they had done some mitigation investigation before they requested a mitigation specialist, did they not? Well, Your Honor, they had interviewed Mr. Tollette, and the record, I would submit, is unclear whether they had called his family members prior to that time. I thought they testified they did. They did testify that they had made some calls. Their billing records contradict that testimony, but at any rate, it was— Didn't the court make a fact-finding about that? The state habeas court? The court likely did find— I don't recall off the top of my head, but the court— Okay, and if it did, that's a reasonable determination of fact if there's contradictory evidence in the record, isn't it? Well, Your Honor, whether or not the defense counsel had conducted some minimal investigation at that point, the— Yeah, but when you say they waited until a month before the trial and that's when they hired a mitigation specialist, that's not what we look at. We don't look at just the date they hired a mitigation specialist. Yes, Your Honor, and certainly there's cases that— where trial counsel have waited until even shorter periods of time, but the point is that the fact that they delayed so long exploring Mr. Talbot's life history in earnest shows their inattentiveness to this life history investigation, and it's important to note how they summarized their investigation up to that point, as Your Honor has noted, the phone calls that they had made in the interviews that they conducted with Mr. Talbot. When they wrote to Pamela Leonard of the Multicounty Public Defender's Office, it's very telling what they— how they described their client. They basically say, we're going through the motions and that we believe that there's not much of a point to conducting this investigation, but we know that we have to. We have to get it on the record that we checked into these things, but at the end of the day, we believe our client is cold-blooded and that— and we're doing this to go through the motions. Well, to be fair, that's not exactly how they put it, right? I mean, they did say some of the things you said, but what they said is, at the end of the day, we may be faced with someone who is cold-blooded, right? That's— we have someone who's cold-blooded, we're just going to go through the motions. We're not going to find anything, but we've got to make a record of it. That's not really what they said. And let me tell you, any trial counsel in a capital case who doesn't make a record of what he did, anticipating the absolutely inevitable claim of ineffective assistance if his client gets a death penalty, is foolish. Of course they had to make a record of it. Yes, Your Honor, that's correct, except I would say that the letter— I would characterize the letter as a little bit stronger in an important way than Your Honors have, and that is that it wasn't just that this may— this may turn out to be pointless. They said we suspect, based on our information in our meetings with Mr. Tollett so far, that this would not bear any fruit. So it's not simply that they may, but they suspected that. I take it in this case, they started early on out speaking to the defendant himself. Then they spoke with the mother, with Willie Robinson, with the sisters. The older brother didn't want anything to do with it. The defendant himself said, I don't want you doing X, Y, and Z. Then they hired a mitigation specialist, did they not, in this case? Yes, Your Honor, some of the interviews that you just mentioned were conducted by that— By the mitigation expert. So the mitigation expert interviewed a number of people, obtained whatever records they could find. They hired— they sought an application for the 97, although they had been on the case since 96. The actual trial of the penalty phase was six months later in November. Do I have that right? It was in November, yes, Your Honor. But six months elapsed from the time they hired the mitigation specialist to the time when they actually put on whatever they were going to put on. My math is a little bit more about five or less months, but that is correct, they eventually did get more time. The trial court did grant a continuance. And we know in Bobby V. Van Hook, the Supreme Court found effective assistance even though those attorneys didn't seek a mitigation specialist until five weeks before what turned out to be the actual trial. Yes, Your Honor. The timing itself is not the decisive factor here, but it is a factor that the trial counsel's inattentiveness to the mitigation investigation from the start. And I think that those early suspicions were borne out by the record in how the defense attorneys presented the case at trial and how they presented the case of mitigation to the jury. And specifically in opening the defense counsel said, you're not going to hear any mitigation investigation. You're not going to hear that Mr. Tallett was abused as a child or that he was a crack baby. You're going to hear, unfortunately, that he committed this tragic crime. Then, as I've mentioned, the only witness to speak on Mr. Tallett's behalf in the entire trial, who was estranged from leading up to trial and who painted a grossly inaccurate picture of Mr. Tallett's childhood and the deprivation, the lack of deprivation that he had experienced. And trial counsel knew that this information was inaccurate from the interview with Ms. Robbins and his mother herself, but also from the other witnesses that Ms. Abernathy, the mitigation specialist, had interviewed. Can I ask you about whether or not some of, not all, but some of the mitigating evidence that you say that trial counsel did not put on constituted what has been referred to as the proverbial double-edged sword? For example, the evidence that he came from a broken home, not that, but that he was then looking for his brothers to try to provide role models for him. When they left, he found gangs to be the source of that support and then was involved in criminal activity with them. Wouldn't that have played into at least part of the state's argument on future dangerousness and have allowed them to try to bring in the other armed vehicle robbery in California? Well, Your Honor, there's no question that some of the mitigation that was developed in habeas proceedings could be considered a double-edged sword in some respects. But it's important to note here that Mr. Tallett's gang affiliation was coming out. It was, he had admitted it in his police statement that was played for the jury during the trial. It was played during deliberations again. Mr. Tallett's criminal history was coming in. And so for defense counsel to sit on their hands and refuse to offer any explanation for why Mr. Tallett had come into those circumstances was unreasonable. He didn't come into those circumstances. He planned and committed, coley calculated, a robbery in which the first thing he did is shoot somebody. Yes, Your Honor. But in terms of his gang history and his criminal activity, the jury had no context for how he came to join a gang in the first place or how he came to commit crimes. I thought part of the context was that when he got out of prison the last time, he could have taken a job in a fast food restaurant, but that wouldn't give him as much money as he wanted. And he had seen drug dealers and criminals with a lot of money, and he wanted that much money. Am I wrong about that? Well, that certainly wasn't presented to the jury. I know, but it could have been if the story was, look, poor fellow, this is how he came to it. Yes, Your Honor. There, as would be expected with most mitigating evidence, there would certainly be some adverse sides to it as well. But there's important additional evidence that really can't be considered as a double-edged sword. And that's, the trial counsel was aware of this information and completely omitted it. And I'll give the court a couple of examples. For one, Ms. Robinson, Mr. Tollett's mother, testified about his father, that all she said was that his name was Arthur Tollett and that he is deceased. The jury never heard that Mr. Tollett's father was a Vietnam veteran who had abandoned his son at birth, and how Leon Tollett, as a young child, begged his mother to invite his father over. And so many times, Mr. Tollett would dress in his best Sunday clothes and wait by the door for his father, only for his father not to show up. Disappointment after disappointment. The jury never heard this. They heard only that he, his name and that he was deceased. Ms. Robinson testified that the Tollett, the Robinson family, the Tollett family, was a family of love, that they were a normal family, that they would sit and talk together as a family, and only eventually his sisters left the house. But what Ms. Robinson didn't, what the jury didn't hear, what Ms. Robinson didn't testify to, which had been in her interview notes and others that Ms. Abernathy had interviewed prior to trial, was that the siblings had left the house under very difficult circumstances themselves, that they had turned to criminal activity and become addicted to drugs. And these were the people that young Leon was looking up to in his life, and that had raised him when his mother was a single mother in the Watts neighborhood and working all the time, so much that she had neglected them. And the jury never heard, what the jury heard about Mr. Tollett's stepfather was that his relationship was not great, not as Ms. Robinson said, it wasn't as close as I would have liked it to be. But what the jury didn't hear was that Mr. Robinson would beat Mr. Tollett severely, and that his mother would never intervene. And these beatings, as Ms. Abernathy had gathered in her investigation, occurred when he was a young child, well before the kind of wrong crowd that Mr. Tollett eventually got connected with, as his mother testified. But there is a very compelling story of Mr. Tollett running away from his stepfather when he was in third grade and spending the night in the park rather than facing what was to come at him. We have a finding by the state court on prejudice, and we have to ask whether that determination was contrary to or an unreasonable application of clearly established Strickland law. If everything you wanted to put in that was not put in had been presented to the jury, where and how do you establish that the determination by the state habeas court on the issue of prejudice was contrary to or an unreasonable application of clearly established Supreme Court law? Well, Your Honor, firstly, the state court effectively discounts to irrelevance all of the mitigation evidence that Mr. Tollett had presented in state trial counsel's post hoc rationalization. The question though is whether any reasonable jurist could reach the determination that the state court judge did. Yes, Your Honor. And your view has to be that no reasonable jurist could come away with any conclusion other than that there was real prejudice here. Yes, Your Honor, and I think... Tell me why that's so. Well, I think the balance of the aggravating and mitigating circumstances. We have a state's case where they held nothing back. This was meant to be a sentencing hearing only, but the state presented as trial counsel acknowledged effectively what they would have done at a trial where there had been a guilt phase. The state held nothing back, and they presented 20 witnesses, none of which the defense counsel cross-examined, did not ask a single question of any of those witnesses, and presented to balance that one witness, a mother begging for her son's life in a mere 12 pages of the transcript. What cross-examination should the defense counsel have engaged in that he didn't, those 21 witnesses? Well, Your Honor, some of the witnesses we've described in our claim related to the trial counsel's failure to rebut the aggravating circumstances here and their failure to rebut the aggravating nature of the crime. The state presented evidence and argued repeatedly that this was an execution-style murder, that it was planned from the moment Mr. Tollett left California. Let me tell you, well, obviously the robbery was loaded firearms. I've never understood the theory that there was no indication they planned to kill somebody. That's why you carry a loaded firearm to the crime. But I don't understand why it is less aggravating or it's more aggravating to say he went up and shot the victim in the head first, and then shot him twice in the legs and once in the back, as opposed to saying he shot him in both legs and in the back, and then with the pistol's sixth firearm, six inches away from his head, gave the kill shot. I don't understand why that version, that second version, is less aggravating. The man's on the ground, he's wounded, and he's shot six inches away through the head. Yes, Your Honor. It certainly doesn't change whether Mr. Tollett was eligible for the death penalty. That's not what I'm talking about. I don't understand why a jury would think more highly of the defendant or less lowly of the defendant if they thought that he wounded him in three ways and then shot him to kill him through the head from six inches away than if they thought he shot him first through the head. I'm not arguing. I literally don't explain that to me. Yes, Your Honor. Well, the difference would be between an execution style murder and a robbery gun, horribly wrong, with admittedly a defendant putting himself in a very dangerous position. There was an execution style murder in this case. Yes, Your Honor. Down on the ground, he's wounded and helpless, and the defendant petitioner takes the gun, holds it six inches away from his head, and fires. That's execution. Yes, Your Honor. I think the critical difference is whether that was the result of a struggle and fright, as Mr. Tollett told the police in his police statement, and whether defense counsel could have corroborated with that with the evidence that was presented in habeas, or whether it was, as Mr. Conger, District Attorney Conger, argued from the start, was a plan to kill Mr. Hamilton and take the money. Did the medical examiner say anything about the shot? He gave many different possibilities, and that was among them, that on the way, as Mr. Hamilton was falling down, that a shot could have occurred. Was it three out of the four witnesses, or two out of the three witnesses who saw the shooting said he appeared to shoot him in the head first? Yes, Your Honor. There was testimony by Detective Ziegler that the shot to head was first, and that all of the shots were to the back of the head, which, of course, was inconsistent with the evidence. The trial counsel did not interview the fourth witness, who was another eyewitness to the crime, who did testify that he observed a struggle. I want to be mindful of my time, and having observed the prior argument, I suspect there may be some questions about the prosecutor's improper argument, so I'd like to turn to that now, if I may. Sure. On top of trial counsel's failures, District Attorney Conger intentionally confused the jury about the life sentencing options to scare them into voting for a death sentence for Mr. Tollett. From the start, during jury selection, District Attorney Conger referred repeatedly to the sentence of life imprisonment as life with parole, insinuating that parole was all guaranteed, not merely a possibility, if the jury chose that option. And then, in closing, he suggested that Mr. Tollett could be released with a life sentence in seven years, something he knew was not possible, and something that, under Georgia law, had one been requested, a mistrial would have been granted. That's how prejudicial the Georgia courts view such an question, didn't ask for a mistrial. Is there anything in this record, it's not in the briefs, but is there anything in this record why trial counsel said he didn't request a mistrial? No, sir, not that I'm aware of. We held in Hammond that it could very well be because the trial had gone about as well as they could go up to that point. Well, Your Honor, the defense counsel did not ask for a mistrial, but they did object immediately to the instruction, which I think signals very clearly that they were concerned about this argument. And unfortunately, they did not ask for a mistrial. And the court overruled the objection and did nothing to correct the gross misstatement of the law. I thought, and we've said in the previous argument, Judge Markson's time got three today and tomorrow, and Judge Jordan's got one. That may be confusing, but I thought the judge gave an instruction to the jury that they were not considered parole. Am I wrong about that? Or that there was no parole for malice murder? Well, there was no instruction given at the time that the district attorney made this comment. The judge did instruct the jury pursuant to the pattern of jury instructions that a life without parole sentence means life without parole. But we know that this jury was struggling with that sentence because they asked not once, not twice, but three times for clarification from the court about Mr. Tollett's eligibility for parole with a sentence of life without parole. And that's when the prosecutor asked the court to instruct the jury on the Georgia statute that allows the Board of Pardon and Parole, if there's a belief or a finding about innocence or residual doubt, to grant a commutation and gave that instruction or read that statute twice, but didn't read the initial instruction about life without parole really means life without parole. That's correct, Your Honor. But in your brief, I think you say in a footnote that you are not challenging the state court's decision of what instruction to read, but are instead challenging the prosecutor's comments, which sought to mislead the jury about the decision that was before them. Is that right? That's correct, Your Honor. The issue before the court is not whether the trial court responded appropriately or not to the questions, but the question, the reason why it's important for this court's consideration is because under clearly established Supreme Court law, under Donnelly, under Darden, the courts are required to consider the context of the entire proceedings, which is what the Georgia Supreme Court did not do here. But it is why we must consider, this court must consider the failure of the court to correct that misstatement of the law. And the very intentional misstatement of the law, I might add, as Your Honor kind of alluded to in the previous argument, this was a prosecutor who had been warned repeatedly by this court against similar arguments and other improper arguments. He knew very well what he was doing here. Difficult and confusing thing about this is you had both malice murder and felony murder charged, did you not? And you also had a lesser crime. So you had no possibility of parole, possibility of parole, possibility of parole. And if the jury had not found malice murder, but had found only felony murder, then parole would have been a possibility, right? Well, Your Honor, Mr. Tollett pled guilty, and he pled guilty to malice murder. So the only options. May I reserve the rest? Yeah, but the other two charges just dropped out. Was that part of a plea bargain or something? I don't know if the felony murder charge dropped out at that point or on appeal. It would have been a lesser included anyway, wouldn't it? Yes, Your Honor. So it would have been subsumed in the higher one. So according to the district court's order, he pled to all the charges. I haven't looked back to see if that's accurate or not, but the district court said that he pled guilty to one count each of malice murder, felony murder, armed robbery, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a crime, as well as two counts of aggravated assault. Yes, Your Honor, I wasn't debating the other crimes. No, I know. I was just bringing it up because I didn't remember correctly what. Was there an objection when the prosecutor said the just punishment, the just punishment under a lot of religions would be death for what he's done? No, Your Honor, there was no objection. That went without any objection. That's correct, but it was still of great concern, great enough concern to the Georgia Supreme Court to point out that that too had been yet another improper argument by this district attorney. I'll reserve the rest of my time for rebuttal. Thank you. Thank you. Ms. Graham. May it please the court. My name is Sabrina Graham. I'm here on behalf of the warden asking this court to affirm the district court's denial of relief. I will start with the prosecutor's argument since that's where we ended. You're correct. I just read the charge, I think, this morning where he, I mean the plea, and Mr. Toilette did plead guilty to all of those, but it was my understanding when they were doing the charge of the charges during the sentencing phase that the prosecutor asked for them not to charge on felony murder because he plead guilty to malice murder, but I could be wrong about that. Most jurisdictions, you can't be convicted of the higher offense and the felony offense. I'm sorry, the lesser included offense because it's automatically incorporated. Correct. Yes. Yes. I think, first of all, it's important to, you'd mentioned Hammond. I'd like to say why this particular case is different than Hammond. In Hammond, there wasn't the possibility of life without parole in that case, and the prosecutor had argued that we don't have that possibility to the jury, and that was what was air in that particular case. It was a different argument, but however, the Georgia Supreme Court did find the prosecutor's argument in this case to be improper, so the question, I think, the easiest question before this court, did that make the proceeding as a whole fundamentally unfair? Before you get into that, I'll ask the question that I asked your colleague incorrectly at the prior argument. Is this gentleman still around trying to work his magic with juries in Georgia? We called our expert, Paula Smith, who heads up the non-death penalty section, and it was her understanding that he's not practicing anymore. We looked on the bar. It doesn't say he's deceased, but she thought he'd passed away because he had a lot of health problems, but that's my best information on that, and I think I know what your next question will be, Judge Jordan, about whether or not Mr. Conger had been I got it wrong in the prior case, which meant it was this case. I think, and it was on an issue regarding arguing facts that weren't in evidence. Right, it was slightly different, but he does have a way with his words, or he did. But back to the fundamental unfairness, I do believe that you can't say that no reasonable jurist would have determined, as the Georgia Supreme Court did, that the trial was not fundamentally unfair simply because of this argument, especially when you look at the totality of the circumstances and, as Judge Carnes pointed out, the execution-style murder that you have here. But he had, but it wasn't just one, and you may be right about the end result given the standards that we have to look at and apply, but it wasn't just the comment about the punishment under various religions. It was also the fact about taxpayer-funded prisons and prison being too good for him and so forth and so on. Right, there were four comments that were improper, like on their face improper. Yes, but I still think that when you look at everything all together, and I'm really unsure here if the court granted a COA on those other two issues. It was just on religion and whether or not, where he mentions religion and whether he mentions parole. I feel the other two issues we have. I know, but if you're looking at the totality of the circumstances on prejudice, you really can't ignore the context of the arguments, right? I agree with you, yes, Judge Gordon. You do have to look at the entirety of the arguments, and the Georgia Supreme Court, contrary to what my opposing counsel stated, I do believe that the Georgia Supreme Court, under their own precedent and state law, did look at all of, look at everything, look at all of the statements that they made, and they determined that it wasn't, that he had failed to show that he was prejudiced in that. Can I ask you a procedural question? Sure. The second issue, which is the alleged ineffectiveness, and I'll ask Ms. Arsenault the same thing when she gets up again. The second issue, which is the alleged ineffectiveness of appellate counsel, is really driven by the first issue, right? Because if Ms. Arsenault is right about the first issue, then the second issue becomes important. If she loses on the first issue, the second issue just washes away. Correct. Right. Okay. Absolutely. Unless the court has any other questions about the improper comment, I will move on to ineffective assistance. Okay. Going to ineffective assistance, first, I'd like to address counsel's investigation and whether or not they were deficient. Obviously, the state habeas court found that their investigation was adequate, and I don't think you could say that no reasonable jurist would have, would say that it wasn't an adequate investigation. I think there's four specific areas that they have honed in on in state habeas that they said they should have delved into, the gangs, the stepdad, depression, and then drugs and alcohol. But trial counsel knew about all of those things. They knew about the gangs. They knew about his drugs. They knew somewhat about the stepdad. I think there's conflicting information in the record regarding what trial counsel knew about that because Mr. Toilette actually filled out a questionnaire for the mitigation specialist in which he was specifically asked whether or not he was corporately punished, and he said, yes, but it didn't really hurt or something along those lines. It wasn't that bad. And also with the depression. So, trial counsel knew that he had been, felt suicidal about his being, I guess, caught for the fourteenth time and locked up. And so, on all those particular things, trial counsel stated, at least Mr. Craft did, that this was a double-edged sword, and we didn't think this was something that we would want to put up before the jury. And that is a reason— Why wasn't it ineffective to basically do nothing? All he did was put the mother on the stand to say, I love my son, spare his life. There's no evidence about mental disability. There's no evidence from an expert there. There's no exploration of the impact of drugs, cocaine, crack in particular. There's no evidence about the beatings. There's no evidence presented really about anything other than a mother seeking a plea for mercy for her son before the jury. Other than that, let's even assume, arguendo, that the investigation was adequate. Nothing was put on the table for the jury, basically. And first of all, I would say that I think the Supreme Court precedent says you don't have to put up anything. Well, I understand that. But assuming that it was adequate, was their decision not to put up any of that information reasonable? Was the decision essentially to put up no defense, other than a plea for mercy? There's certainly that. Certainly. And I think that was a pretty heartfelt plea. I mean, she did cry, there was a great effect there. And she did apologize to the victim. But save for that, there was not a shard of evidence. Nothing whatsoever was presented on behalf of the defendant. I think that's a reasonable decision in this particular case, because every avenue that they could have put up would have brought in aggravating evidence. And as you know, I mean, the state was tenacious in this case. And I think that if they put in information regarding his mental health, then the state would have called the West Central doctors who testified, who had given a report stating they had antisocial personality traits. I think that if they had put in stuff about gangs, then the state would have countered with, okay, well, he's not 18, 19 years old. He was 26 when he committed this crime. He's been arrested and arrested and arrested. This is just a career criminal, and now he's trying to make an excuse. Regarding drugs and alcohol, again, trial counsel thought that was a double-edged sword, which it very well could be. And there wasn't really a lot of... See, I can accept that in many, many contexts that would be so, and we've said it. But I'm just asking in the context of this case, where they basically put on nothing other than a plea for mercy, that it was a drug addict might have well been relevant to explain conduct, but it wasn't offered in any way. No experts got on the stand to say, here's the consequence of the level of addiction that he had. Nothing was put on at all. The beatings that they claimed occurred, no presentation about that. They couldn't go on residual doubt because, of course, he had pled guilty. So what little they had, they didn't use, I suppose, because they thought it would have hurt more than it helped. But I'm asking whether that was a reasonable strategy, where they had nothing and presented nothing other than a mother's plea for mercy. I still think it was a reasonable strategy in this particular case, given this particular crime. If it were a different kind of crime, maybe not. But you have someone who has a Greyhound bus all the way across the United States in order to carry out an armed robbery. You have three eyewitnesses saying that he walked up to him and shot him directly in the head, or shot him in the head and then shot him some more. In this particular case, so you have, if you're going to put up any of that information, it's going to bring out all the aggravating evidence. Let me ask you this. Did the jury hear anything about his prior convictions? And imprisonment? They did hear about the prior convictions, yes. You say that a mental health expert would open the door to Tillett's incarceration history, which consisted of 13 imprisonments. But if the door has already been opened, somebody's walked through it. I think that in this particular case, the trial counsel testified that they did not want to continue to harp on that, that they didn't want to bring attention to it. And they also felt like, let me point out that the district attorney had asked prior to trial for Mr. Tillett to be re-evaluated by the West Central doctors regarding whether or not he could be housed safely. And that was something that trial counsel very much did not want to happen. They didn't know if it would be good or bad, and they felt that they could have aggravating information there. But I guess, and maybe Judge Karnes, Chief Judge Karnes is not getting at this, but if not, I'll get to it. If the state is proceeding at the very least on a theory that the defendant should be sentenced to death because of what he did and who he is, and has introduced evidence of his prior convictions, and if his prior statement in one shape or form came in alluding to the gang membership, what do you have to lose to take that evidence on or at least explain it or give shape to it in one way, shape, or form? It's one thing if, and again, it doesn't drive the result, but it's one thing if the state had stayed away from it, and then you don't want to open the door so that the state continues to stay away from it. That's one thing. But if the state which goes first has already put it on, don't you have some sort of obligation to try to do something with it or at least deflect it to the extent, maybe the answer is you can't, but it can't be that you don't want it out because it's out. That can't be the reason. That's not a reasonable strategic decision. I agree with, I agree, Judge Jordan, that if it, it was out. It just wasn't, the state did not spend a lot of time on his prior convictions, bringing out those prior convictions during testimony, and regarding the gang, that came out through a petitioner's statement he gave to law enforcement, but it wasn't, it wasn't, I guess in this particular case, if they had spent more time with it, then it would have just given the state more opportunity to attack it, and I feel like that is a reasonable strategic decision. You know something's going to come in. Why would it have been reasonable strategically to keep a mental health expert out, and why would it be strategically reasonable to make no reference to the beatings that he sustained as a young boy? So regarding the mental health evidence, trial counsel testified that they had him evaluated by Dr. Grant. He spent two days with him, eight hours a day, and they called up Dr. Grant, and they said, what can, you know, you do for us, and according to trial counsel, Dr. Grant said, don't put me on the sand. I can't help you. He's as sane as you and I. They did not feel like there was anything there they could put up that was helpful, and again, you had those West Central reports stating that he had antisocial personality traits, so that would have been aggravating to them. They didn't think there was anything necessarily mitigating there other than maybe he could be housed safely. They did testify to that. What was the last? The beatings. The beatings. In that particular instance, the trial counsel testified that they knew that he had been corporately punished, but it didn't rise to the level of what they're saying, beatings. They said they thought that many members of the jury had received the same, and they would have thought he should have received more. Otherwise, he may not have gone to a gang, but I think in this particular instance, when you look at it, you have, before the court, you have their school records. You have affidavits from family members, and you have very, very, very little evidence here that he was beaten other than from Mr. Tolla and I think one of his sisters. That's the only people who are saying this. There are no defects records. There's no evidence actually that he was deprived of anything. There's nothing in the school records showing this. It's a very scant record on showing the beatings, but again, even if they should have put up the beatings, I don't think that that would have mitigated this particular crime. Even suppose his stepdad beat him. He was 26 when he committed this crime. He wasn't a kid anymore. I don't see how that might take as your position, and even if it all had gone in, the good and the bad, the beginning, the middle, and the end, the state court was not unreasonable in its determination about prejudice. Correct. Yes. Even if you assume that they were deficient in every way, I don't see any prejudice here considering the fact that you're going to have a great deal of aggravating evidence that's going to come in with the mitigating evidence and the nature of the crime in this case. Of course, all they had to do was convince one juror, right? But we aren't here under the one juror standard. We're here under AEDPA. Right. So the last issue I think that was addressed by opposing counsel was Mr. Trestle and the crime scene reconstruction that he put together. There's just a couple of things I'd like to point out. I think there were actually two people who were eyewitnesses for the actual shooting, and then my opposing counsel mentioned that there was a statement from, I think, a Mr. Grantham who stated that they were struggling over the weapon. It was a statement he gave to law enforcement, not before the jury. But actually what Mr. Grantham stated was that he saw them close together. They may have been struggling or they may have just been close together. That's the only person who says anything coming close to Tolette's rendition of the crime, that there was a struggle and that's when the gun went off. That's just speculation on the part of Mr. Trestle. As far as the medical examiner's testimony is concerned... Was he the only one who approached the Brinks truck? Yes, he was. Regarding the medical examiner's testimony, I don't recall the medical examiner stating in there that there could have been a struggle with the weapon. He does talk about the trajectory of the bullets, but I don't recall him saying that it was indicative or not indicative of a struggle. I don't recall him being asked that at all. I could be wrong about that, but I don't think that was a question before him. The only information they had before the state habeas court was Mr. Trestle speculating that there was a struggle and that's when possibly the kill shot went off. There's no way to know exactly what order these bullets went in, but it doesn't matter. We know this man came across the country to rob this car. He said it. I came to hustle money. We know that was his purpose to come there. He showed up with a weapon. His buddy was across the street with a weapon. The man didn't even get his pistol out of his car. The shots were in and I don't think there's really any conclusive evidence showing at all that there was a struggle with this weapon other than Mr. Grantham's equivocal statement to law enforcement. Other than that, all the witnesses before the jury said, we saw ... Obviously, I think when you see something that traumatic, you can mix things up in your head. It's like the law enforcement officer stated when she was pulled up and she saw him shoot the victim, she felt like she was watching a movie because it just seemed so unreal. She thought they were filming something. It's not unusual that they would mix up where they actually saw them shoot, but they all testified that the shots were one after another, bang, bang, bang, bang, bang. There was no testimony that there was some sort of lapse in there where there was a struggle. I would submit that as found by the Georgia Supreme Court, when they did the CPC application, you still haven't shown prejudice there because no matter what order they're in, no matter how you do it, he showed up there to rob that Brinks truck. He got out with a gun and the man never had a chance. Unless the court has any other questions for me? We don't. Thank you. Thank you. Ms. Arsena, six minutes, I believe. Thank you, Your Honor. I'd like to start by addressing a critical admission I made in my argument in terms of one of the failures of trial counsel that came up in Ms. Graham's argument, which is Mr. Tollett's depression. There is no question on this record that every single person who evaluated or interacted with Mr. Tollett during trial proceedings, leading up to trial had feelings of hopelessness, lethargy, that he was feeling depressed. What trial counsel failed to do was investigate whether that depression was a result of his circumstances or whether that depression preceded the crime. In fact, it did. Is there any evidence in the state collateral record before us that depression leads you to shoot someone execution style or non-execution style in the course of a robbery? Well, Your Honor, Dr. Hilton, yes, does testify in state habeas proceedings the impact of all of Mr. Tollett's life history, including the major depressive episode that he was experiencing leading up to the crime that was a factor in why he would choose to participate in the crime. The reason I ask, I've been listening to these arguments and reading the affidavits and some of the briefs for more than a quarter of a century, I've never really heard that depression leads you to commit violent crimes. Well, it certainly wouldn't be a requirement that Mr. Tollett show that in order for it to be mitigating. I know, but it sounds like you were arguing it as it was a factor in the crime as opposed to to humanize him and show what he'd suffered unrelated to the crime. Well, it's a factor in the, it's one of the factors in the circumstances, the events leading up to Mr. Tollett's decision to go to Georgia at Mr. Womack's request. So there's evidence he was depressed, therefore he went to Georgia to commit violent crimes. I don't understand that. Well, Your Honor, what the evidence showed and what through the lay witness testimony of Katrina Wilson, who was a former girlfriend of Mr. Tollett's, what she could have testified to and what she did testify to in state habeas was that Mr. Tollett in the months leading up to the crime was on a very significant downward spiral, that he had lost weight, that he was crying uncontrollably, that he was effectively homeless, that he was in and out of motel rooms and living out of his car. And these are the, it's not necessarily a perfect link in terms of his depression caused him to is that his life was in a state of deterioration and that his feelings of depression did not relate solely to the circumstances, the legal circumstances that he was facing with the murder charges, but that this was something he'd experienced his entire, throughout his life and that that was something the jury should have heard. And I also didn't address Judge Marcus, your question about the California robbery, which I believe we've addressed very adequately in our briefs, but I'll say quickly that there's, there was no circumstances under which the California robbery was coming into this case. The state, again, as I said before, did not hold anything back. They've intended to introduce evidence of the California robbery against Mr. Womack because the evidence was very clear that it was coming in against, that he, that he had played a part in that crime. That was not true for Mr. Tollett and had it been true, the state certainly would not have waited for the defense to open the door to anything. They would have put it on in Mr. Tollett's trial itself. So that, that was not a reasonable decision on trial counsel's part in failing to put on the evidence of future dangerousness or whether to call Ms. Wilson. The, Ms. Graham also made a very important point about trial counsel's consideration for future dangerousness. What she said was they didn't know whether it was going to be good or bad. And that's, that's the problem here. That's why their decision can't be reasonable because they did not explore whether, whether this would be helpful for Mr. Tollett or not. And I would submit that the evidence and state habeas showed that this would have been a helpful line of mitigation for them to consider and one that Dr. Grant had, had encouraged them to consider given Mr. Tollett's successful adaptation to incarceration. I'll just, in the, in the very little time I have left, address briefly the improper argument by the prosecutor. This is the very, this is very similar confluence of factors that this court found in the Romine decision where the, the argument has a, has an impact on the, the jury's decision. We know that this jury was struggling with the, the sentence of life without parole, but based on their three requests for clarification from the court. We know that the prosecutor intentionally misstated the law and made inappropriate remarks during defense counsel's closing when they were attempting to correct the, his misstatement. And the, the Georgia Supreme Court here failed to consider the record in its entirety. They considered each argument on its own, individually, not in the context of the entire record. And, and they also, You base that on the fact they didn't, they simply didn't say, and we consider each of these arguments in the context of the entire record, in cumulatively. That, that is part of, part of the argument. Yes, Your Honor, but the, If you're going to write an opinion, you better be careful because if you don't spell out everything, we will say that you erred by not considering that thing you don't spell out. Well, Your Honor, I don't, I don't think it's a matter of magic words by the, by the court. I'm not talking magic words. If you can, if you'd address an issue, you've got to specify every factor that you considered or otherwise we will have a federal court determining you committed error by not considering that factor. Well, Your Honor, I don't think that that would be a reasonable standard to impose on the lower courts. I think that, but I think that we can tell from this opinion that this is the rare case where they did not do that, that full consideration that they're required to do. Because they didn't say they were doing it. No, not, not simply for that reason, but because they, the Georgia Supreme Court said that this error was cured by the jury being instructed on life without parole. But we know that the jury remained confused even after that instruction. That's a different thing. I thought I heard you arguing the Georgia Supreme Court, we know, didn't consider the entire context of the trial because they didn't say they did. Well, I was making that additional point, yes, Your Honor, that, that, yeah. But they might agree with you, but I, we can't have state courts told that you've got to spell it out for us or we're going to give you a C minus or a D on your paper. Yes, Your Honor. I think, I think the more important point is that the Georgia Supreme Court did not consider the fact that the jury three times asked for clarification about this very sentence that they think cured the prosecutor's argument. You and I are passing each other in the night because, again, you're saying that because they didn't say they didn't consider, they did consider it. They didn't say they considered it, so we know they didn't consider it. I, I do submit that's a fair reading of their opinion, but, but apparently we may not agree on that. I appreciate it. I know where you're coming from and didn't mean to criticize your argument. We will take that case under submission. Thank you, counsel.